# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ANTHONY L. WINSTON,**

    **Plaintiff,**

    **v.**                                                               **Case No. 18-CV-1802-SCD**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## DECISION AND ORDER

In 2012, Anthony L. Winston applied for Social Security benefits, alleging that he is unable to work due to chronic pain in his back, neck, hips, and shoulders. Following a hearing, an administrative law judge (ALJ) determined that Winston remained capable of performing his past job as an electrical accessories assembler notwithstanding his impairments. Winston now seeks judicial review of that decision.

Winston argues that the ALJ violated his right to due process and improperly evaluated certain treating source opinions. The Commissioner contends that the ALJ did not commit an error of law in reaching his decision and that the decision is otherwise supported by substantial evidence. Because the ALJ erred in evaluating the opinions of Winston's primary physician, the decision denying Social Security benefits will be reversed and this matter will be remanded for further proceedings.

# BACKGROUND

Winston was born on February 20, 1950. R. 175.[1] After graduating high school, he worked in various unskilled trades. *See* R. 178–80. In 2004, Winston injured his back while working at J.W. Speaker as a mold machine operator. *See* R. 180–83. His employer accommodated the injury by reassigning him to the less-strenuous assembly department, which allowed Winston to alternate between standing and sitting, and by not requiring the same level of productivity as other employees. R. 182–87. Despite these accommodations, Winston's pain progressively worsened and infiltrated his neck, shoulders, and hips. *See* R. 975–76, 989. Because of his reduced capabilities, in early 2011, Winston's employer reduced his work hours. *See* R. 511.

In February 2012, Winston applied for disability insurance benefits from the Social Security Administration (SSA), alleging that he became disabled on January 7, 2012. R. 340–41. Winston asserted that he was unable to work due to the following conditions: chronic neck, back, and shoulder pain; degenerative disc/joint disease in his lumbar and cervical spine; arthritis in his neck, shoulders, back, and hips; bursitis in his hip/leg areas; generalized anxiety and stress; and heat intolerance. R. 452. After initially being denied at the local level, *see* R. 238–59, the Social Security field office denied Winston's application because he continued to work and earned income exceeding substantial gainful activity levels after his alleged onset date, *see* R. 248–59. Winston was working between twenty and thirty hours a week, earning just over $15 per hour. *See* 342, 344, 347–84, 424–30, 531–33, 587.

After his application was denied at the reconsideration level, *see* R. 260–76, Winston appeared before ALJ Jeffry Gauthier for an administrative hearing on January 11, 2017, R.

---

[1] The transcript is filed on the docket at ECF No. 10-2 to ECF No. 10-25.

150–58. Immediately prior to the hearing, the ALJ noted off the record to Winston's lawyer that Winston had worked above substantial gainful activity levels after his alleged onset date. *See* R. 153. When they returned to the hearing room, the ALJ went on the record and summarized their conversation:

> So Counsel, we had a conversation prior to the hearing, prior to going on the record, in which I reviewed with you some of the ways in which I was viewing the objective medical evidence as well as some of the pain complaints that were in the record as well. And I indicated that I thought there was a point where it became more clear that the Claimant was disabled.
> I asked you to inquire with the Claimant whether he was interested in amending his alleged onset date for the six or seven different reasons that we discussed. You left the room. You went and had a conversation with Mr. Winston. What were the results of that conversation?

R. 153. Winston's lawyer responded,

> Well, we're not satisfied with an onset date in 2014. . . . One of the issues is substantial gainful activity, and he insists that there is a memo from the local office that deals with this issue. I want to find that. . . . I think their conclusion was that 2012 was [substantial gainful activity,] . . . and they proposed an alternative onset date in January of 2013.

R. 153–54. Winston's lawyer then requested a continuance to "do some sorting out" on the earnings issue. R. 154. Meanwhile, the ALJ located the memo referenced by Winston's lawyer:

> Yes. It is this. I'll give you a copy before you leave today. Again, it's not marked as an exhibit in the file, but this is what I was referencing when we were talking before we had gone on the record. . . . And it says January 1st of 2013. So that is the onset date that they were pointing to, and this was done in September of 2014. . . . It's SSA 823, which is a report of [substantial gainful activity] determination. And it says for SSA use only.

R. 155. The ALJ granted Winston's request for a continuance and advised that, "if there's something more that you wish to go beyond [the SSA 823], then I need a detailed analysis, spreadsheet, annual wages, appropriate deductions" of Winston's earnings for the years in question. R. 156.

3

The hearing was continued to May 31, 2017. *See* R. 307. Prior to that hearing, Winston's lawyer submitted documentation indicating that Winston had been working above substantial gainful activity levels until December 1, 2013. *See* R. 655–56. At the hearing, Winston's lawyer stated that he viewed "this case as merely a case involving onset date; what date did Mr. Winston become disabled." R. 166. After explaining the possible onset dates, Winston's lawyer remarked that "[i]t sure does seem like the sort of case that we ought to be able to resolve." *See* R. 166–72. The ALJ responded,

> Well, I don't know what you want me to do. I am the Judge. I'm the Administrative Law Judge. I kind of tip my hand in thinking -- it's unique; we know that it's a unique case. You're making a unique argument. Most people would not come in here and say, wow, in 2012, he earned $15,000 or so; in 2013, he earned $16,000 or so and, you know, he continued to work in 2014 and he continued to have some work in 2015 but the AOD is December of 2011 or January of 2012. So you've talked to him. What do you want from us? I can't -- I'm going to resolve it when I go back and I pour through all the evidence and I'm going to have an attorney also working alongside of me who is going to go through all that evidence and, you know, and then I'm also going to be faced with do I, you know, worry about it or do I just say what is his -- this is his issue. This is where he might have concern, which I trust again, as you, a person of great years or experience doing this, explained to him that what his RFC might have been in 2012, 2013 2014 -- well, definitely 2012 and 2013, to a lesser extent 2014, may not be the same as what it would have been in 2015 or 2016. Because the medical records continue beyond -- and conditions progress.

R. 172–73. Winston's lawyer then requested to talk with his client off the record. R. 173. When they returned, Winston amended his alleged onset date to December 1, 2013. *Id.*

Winston testified that he was unable to work due to chronic pain in his back, hips, shoulders, fingers, and hands. *See* R. 197–212. He also suffered from kidney disease, chronic obstructive pulmonary disease, and mental-health issues. *See* R. 212–18. Winston testified that he started working at J.W. Speaker in 2002 and that he was given special accommodations as his health condition worsened. *See* R. 181–95. Unable to keep up with his work demands

4

despite those accommodations, he was eventually laid off entirely. *See* R. 194.

Applying the standard five-step process, *see* 20 C.F.R. § 404.1520(a)(4), on September 5, 2017, the ALJ issued a decision concluding that Winston was not disabled. *See* R. 21–44. The ALJ determined that Winston had not engaged in substantial gainful activity during the period from his amended alleged onset date (December 1, 2013) through his date last insured (December 31, 2015). R. 26. The ALJ found that Winston's physical impairments limited his ability to work, but none (alone or in combination) met or equaled the severity of a presumptively disabling impairment. R. 27–30. The ALJ next determined that Winston had the residual functional capacity (RFC) to perform light work, but he could only frequently reach overhead with his upper extremities, and he needed to be off task less than ten percent of the workday, in addition to normal breaks. R. 30–36. In assessing Winston's RFC, the ALJ gave "little weight" to the opinions of Winston's primary physician, Eric Luy, M.D., and "some weight" to the opinions of the state agency medical consultants. R. 32–35. The ALJ determined that, in light of his RFC, Winston was able to perform his past relevant work as an electrical accessories assembler; therefore, he was not disabled. R. 36.

After the SSA's Appeals Council denied review, *see* R. 1–7, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016), Winston filed this action on November 13, 2018. ECF No. 1. The matter was reassigned to this court in May 2020 after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 34, 35, 36. The matter is fully briefed and ready for disposition. *See* ECF Nos. 18, 28, 29.

5

Case 2:18-cv-01802-SCD    Filed 06/19/20    Page 5 of 18    Document 37

# APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings."

6

*Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Winston contends the ALJ violated his due process rights and erred in evaluating the opinions of his treating physician.

### I. Alleged Due Process violation

Winston initially alleged that he became disabled on January 7, 2012. R. 340. At his administrative hearing in January 2017, the ALJ stated that, based on his view of the objective medical evidence and some of Winston's pain complaints, he "thought there was a point where it became more clear that [Winston] was disabled." R. 153. However, because it appeared that Winston had engaged in substantial gainful activity after January 2012, the ALJ

7

asked if Winston would consider amending his alleged onset date. *Id.* Winston's lawyer indicated that he wasn't "satisfied with an onset date in 2014"; he then requested (and was granted) a continuance to sort through Winston's earnings for those years. *Id.* at 153–57. At the follow-up hearing in May 2017, Winston amended his alleged onset date to December 1, 2013. R. 173. The ALJ ultimately denied benefits, finding that Winston was not disabled at any time from the amended alleged onset date through the date last insured. R. 36.

Winston argues that the ALJ violated his right to due process by denying benefits not based the record evidence, but because Winston refused to amend his alleged onset date to 2014. *See* ECF No. 18 at 13–17; ECF No. 29 at 8–10. In support of his argument, Winston relies almost entirely on *Martin v. Barnhart*, where the court found that the ALJ created an "appearance of impropriety that undermine[d] the ultimate decision in the case" by implying that he would award benefits to the claimant if she amended her onset date of disability. *Martin v. Barnhart*, 319 F. Supp. 2d 1381, 1384 (S.D. Ga. 2004). The Commissioner argues that Winston voluntarily amended his alleged onset date, that *Martin* is distinguishable, and that the ALJ's hearing comments did not amount to a due process violation. *See* ECF No. 28 at 3–10.

Applicants for disability benefits have the right to a hearing before a fair decisionmaker. *Spicher v. Berryhill*, 898 F.3d 754, 756 (7th Cir. 2018) (citing *Keith v. Barnhart*, 473 F.3d 782, 787–88 (7th Cir. 2007)). An alleged due process violation merits a new hearing "only if the 'decisionmaker displayed deep-seated and unequivocal antagonism that would render fair judgment impossible.'" *Spicher*, 898 F.3d at 756 (quoting *Keith*, 473 F.3d at 788). Winston has not cleared this high bar.

First, the record does not substantiate Winston's claim that the ALJ pressured him into amending his alleged onset date. The ALJ clearly believed that Winston had engaged in substantial gainful activity after his alleged onset date, so he suggested that Winston amend to a later date. When Winston's lawyer indicated that he and his client were not satisfied with an onset date in 2014, the ALJ did not press the issue; indeed, he granted Winston's request for a continuance to further investigate the earnings issue. *See* R. 153–57. At the follow-up hearing, the ALJ did not ask Winston whether he wanted to amend his alleged onset date. *See* R. 161–66. Rather, Winston's lawyer raised the issue and proposed three possibilities. R. 166–68. The ALJ did not insist on any of those dates; he simply "want[ed] to know what [Winston's] choice [was]." R. 168. Winston asserts the ALJ applied pressure when he emphasized the time it would take "to go through all [the] evidence" on the earnings issue. ECF No. 18 at 14 (citing R. 172). But that comment simply reflects that the ALJ was going to resolve the issue after examining the evidence, not right then at the hearing. After discussing the options with his lawyer, Winston decided to "accept[ his lawyer's] recommendation to amend the alleged onset date to December 1, 2013." R. 173. The record therefore shows that Winston's decision to amend was a voluntary choice and was made with the advice of counsel.

Second, the record does not support the inference that the ALJ retaliated against Winston for refusing to amend his alleged onset of disability to a date in 2014. Winston maintains that, after he declined to amend his onset date to 2014, "the ALJ's stated view of the medical evidence shifted significantly, going from showing 'clear' disability in 2014 and 2015, to finding no disability at all." ECF No. 18 at 14 (*comparing* R. 153 *with* R. 36). Although the ALJ indicated at the January 2017 hearing that the record appeared to support a disability

9

finding at some point, Winston has not cited any authority establishing that the ALJ was bound by his initial view of the evidence. More importantly, nothing in the record suggests that the ALJ rendered the unfavorable decision in retribution for Winston's refusal to amend his onset date as suggested by the ALJ. Instead, it appears the ALJ simply changed his mind after listening to the hearing testimony and reviewing all the evidence. Moreover, Winston did significantly come off his initial alleged onset date, settling on December 1, 2013—a date much closer to the ALJ's alleged preferred date in 2014. It seems unlikely that the ALJ so resented Winston for not getting all the way to 2014 that he issued a fully unfavorable decision even though he believed Winston to be disabled.

Finally, I agree with the Commissioner that *Martin* does not carry the day here. The district court remanded in *Martin* because the ALJ there considered extrajudicial evidence in deciding whether the claimant was disabled and created an appearance of impropriety by ostensibly conditioning the award of benefits on the claimant amending her claim. *Martin*, 319 F. Supp. 2d at 1383–84. At the end of the administrative hearing the ALJ said,

> Counsel, . . . I want to encourage you to talk to [Plaintiff] and see if there's not some way that you might make it easier on a Judge that was wanting to do something nice for a nice person and—like [Plaintiff] in terms of getting her some benefits . . . if you, for instance, you wanted to amend your onset date or take some other action that I had thought of.

*Id.* at 1384. Here, however, there was no *quid pro quo*. When Winston's lawyer expressed that he thought the case could be resolved, the ALJ responded by saying he would resolve it only after going back through all the evidence. *See* R. 172–73. Nothing in the record suggests that the ALJ conditioned an award of benefits on Winston amending his alleged onset date. The ALJ simply tipped his hand that he did not believe Winston would be eligible for disability

10

benefits as far back as his initial alleged onset date because he had engaged in substantial gainful activity after that date.

In sum, Winston has failed to demonstrate that the ALJ displayed the deep-seated and unequivocal antagonism over Winston's refusal to amend his alleged onset date to 2014 necessary to establish a due process violation.

## II. Treating source opinions

Dr. Luy, a specialist in internal medicine, began treating Winston in April 2004. *See* R. 456, 603, 612. His treatment notes reflect that Winston suffered from chronic pain in his neck, back, and shoulders due to degenerative disc and joint disease and arthritis in his hips. *See* R. 612, 627. In February 2011, Dr. Luy wrote a letter indicating that Winston could return to work with a thirty-hour workweek restriction. R. 599. Thereafter, Dr. Luy completed several return-to-work evaluation forms and wrote a number of letters excusing Winston from work and allowing him to return to work under specific conditions. *See* R. 602, 604–06, 612–14, 621, 627–28, 632, 636, 639–41, 643, 645, 867–68. Dr. Luy generally limited Winston to working less than a forty-hour workweek, sitting four to eight hours per workday, standing one to four hours per day, walking one to four hours per day, and lifting no more than ten pounds. Dr. Luy indicated that Winston needed to alternate positions every twenty minutes and limit standing to short periods. He also advised that Winston should avoid bending, squatting, twisting, reaching upward, and repetitious movement. According to Dr. Luy, these work restrictions would persist for the duration of Winston's life.

In March 2015, Dr. Luy completed a medical opinion regarding Winston's work-related activities. *See* R. 120–24. Dr. Luy opined that, beginning in 2004, Winston was limited to lifting and carrying less than ten pounds; Winston could stand and walk for less than two

11

hours in an eight-hour workday; and Winston could sit for less than two hours per workday. R. 120. Dr. Luy further opined that Winston could sit and stand, respectively, for twenty minutes at a time before he needed to change positions; thus, he needed to be able to shift positions at will and would need to take about ten unscheduled breaks per workday. R. 121. According to Dr. Luy, Winston could never twist, stoop, crouch, climb stairs, or climb ladders; Winston had a limited ability to reach, handle, feel, and push/push; and Winston needed to avoid all exposure to extreme cold, extreme heat, wetness, humidity, pulmonary irritants, and work hazards. R. 122–23. Finally, Dr. Luy opined that Winston would be absent from work more than three times per month as a result of his impairments. R. 124.

The ALJ assigned little weight to Dr. Luy's opinions for four reasons. R. 33. First, the ALJ noted, "Dr. Luy's opinions, when reviewed in consecutive order, are inconsistent without explanation. For example, Dr. Luy opined that [Winston] had fewer limitations in August 2013 than he did in December 2011 and December 2013." R. 33 (*comparing* Ex. 27E at 35 [R. 631] *with* Ex. 11F at 2 [R. 868]; Ex. 27E at 18 [R. 614], 36 [R. 632], 40 [R. 636]). Second, the ALJ reasoned that "Dr. Luy's opinions are at odds with the diagnostic evidence," which showed "only mild degenerative changes in the affected areas and 'mild to moderate' posterocentral cervical disc bulges." R. 33–34 (citing Ex. 1F at 9–10 [R. 711–12]; Ex. 3F at 1 [R. 771]; Ex. 15F at 1 [R. 953], 6 [R. 958]; Ex. 13F at 1 [R. 890], 3 [R. 892], 30 [R. 919]). Third, according to the ALJ, "Dr. Luy's opinion is inconsistent with his treatment of [Winston]." R. 34. The ALJ noted that, "while Dr. Luy continued to provide greater work restrictions to [Winston] overtime [sic], he offered [Winston] very little other treatment other than renewed prescriptions for Tramadol and Baclofen, and hip injections in December 2014." R. 34 (citing, e.g., Ex. 18F at 19 [R. 1046]; Ex. 13F at 1 [R. 890], 3 [R. 892]). Fourth,

12

the ALJ pointed out that, "as of January 2016, Winston reported only baseline stiffness in hips, back, neck, shoulders, which he treated with Tylenol." R. 34 (citing Ex. 28F at 18 [1354]).

Winston argues that the ALJ erred in evaluating Dr. Luy's opinions. He accuses the ALJ of misreading the record with respect to the consistency of Dr. Luy's opinions. *See* ECF No. 18 at 17–18. According to Winston, the signature on the August 2013 opinion that the ALJ flagged as an outlier does not match Dr. Luy's signature; thus, Dr. Luy did not actually render the only allegedly inconsistent opinion. *See id.* (*comparing* R. 124, 606, 639 *with* R. 631). Winston also contends that the ALJ failed to evaluate Dr. Luy's opinions in accordance with the regulatory factors found in 20 C.F.R. § 404.1527(c)(2). *See* ECF No. 18 at 19–21. Specifically, he maintains the ALJ did not consider Dr. Luy's extensive treatment relationship with Winston or his specialty in internal medicine. Winston further asserts that the ALJ placed too much emphasis on the supportability factor (he accuses the ALJ of improperly "playing doctor" by interpreting the diagnostic evidence) and the fact that Winston had never undergone surgery on his ailing neck, back, and shoulders. The Commissioner argues that the ALJ reasonably assigned little weight to Dr. Luy's opinions. *See* ECF No. 28 at 12–17.

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)); *see also* SSR 96-2p, 1996 SSR LEXIS 9, at *1–4 (July 2, 1996). An opinion that is not entitled to controlling weight need not be rejected. Instead, the opinion is entitled to deference, and the ALJ must weigh it using several factors, including the length,

13

nature, and extent of the claimant's relationship with the treating physician; the frequency of examination; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the physician is a specialist. *See* 20 C.F.R. § 404.1527(c); *see also Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1087 (E.D. Wis. 2009). Moreover, the ALJ must always give "good reasons" to support the weight he ultimately assigns to the treating physician's opinion. *See* § 404.1527(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Only "the most patently erroneous reasons for discounting a treating physician's assessment" require reversal. *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010) (citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)).

It appears that the August 2013 Return to Work Evaluation Form, which contained more modest limitations than the others, was filled out and signed by someone other than Dr. Luy. Dr. Luy's signature is distinct and relatively consistent:



R. 614; *see also* R. 124, 606, 628, 867. By contrast, the signature on the August 2013 Form is clearly not like the others:



14

R. 631.[2] In addition to the non-matching signatures, other features of the August 2013 Form suggest that it was completed by someone other than Dr. Luy. For example, Dr. Luy has a slanted writing style, he consistently referred to his patient as "Anthony Winston," he indicated that the length of Winston's restrictions was "lifetime," and he used hyphens to separate the month, day, and year in a date. *See* R. 120, 124, 605–06, 612–14, 867. The author of the August 2013 Form has a curvier writing style, referred to the patient as "Tony Winston," indicated that Winston's current restrictions were "ongoing > 1 yr," and used a forward slash in his or her date. *See* R. 631. No expertise is needed to make these observations. Putting aside the August 2013 Form, Dr. Luy's opinions are remarkably consistent.

The Commissioner maintains that any error the ALJ made with respect to the August 2013 opinion is harmless because the ALJ provided other valid reasons for discounting Dr. Luy's opinions. *See* ECF No. 28 at 15–16. "An error is harmless only if [the court is] convinced that the ALJ would reach the same result on remand." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (citing *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011)). Here, I am not convinced that the outcome is foreordained.

At the time of the ALJ's decision, Dr. Luy had been treating Winston regularly for more than thirteen years. He first saw Winston after Winston injured his back at work, and he observed Winston's condition deteriorate over time. The ALJ, however, didn't consider this extensive treatment relationship. *See* § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."); *see also* § 404.1527(c)(2)(ii) ("Generally,

---

[2] See, e.g., *Rodriguez v. Astrue*, No. 1:09-CV-00240-MP-GRJ, 2011 WL 2712639, at *1 (N.D. Fla. July 13, 2011) (addressing handwriting discrepancies). It is not this court's role, as a reviewing court, to decide factual questions in the first instance; instead, on remand, the Commissioner may consider how to resolve the issue conclusively.

the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion."). Nor did the ALJ mention Dr. Luy's specialty in internal medicine, despite its reference in the record, R. 603. *See* § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). Given these facts, "the checklist required the administrative law judge to give great weight to [Dr. Luy's] evidence unless it was seriously flawed." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (citing *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006)).

The ALJ's other reasons for giving little weight to Dr. Luy's opinions do not show that the opinions were seriously flawed. While some of the diagnostic evidence cited by the ALJ labeled Winston's impairments as "mild" or "moderate," one note states that Winston's old x-rays and MRIs confirm the presence of "significant" degenerative disc and joint disease. *See* R. 958. Moreover, the ALJ failed to explain *how* Dr. Luy's opinions were at odds with the mild diagnostic findings. *See Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) (holding that ALJ erred in characterizing mild to moderate degeneration as "unremarkable"). Dr. Luy did not believe that Winston was completely incapacitated; rather, most of his opinions limited Winston to part-time work with additional restrictions.

Similarly, the ALJ failed to explain how Dr. Luy's opinions were inconsistent with his treatment of Winston. The ALJ seems to suggest that, if Winston were as limited as Dr. Luy opined, then he would have recommended more invasive treatment. But Dr. Luy's opined limitations were not "extreme," Dr. Luy did treat Winston with narcotic pain medications, and surgery may not have been appropriate at Winston's advanced age. The last reason provided by the ALJ—that Winston reported only baseline stiffness at one doctor visit in

16

January 2016—does not significantly contradict Dr. Luy's opinions, the last of which was made in March 2015. Indeed, by late 2016, Winston reported that his condition had worsened, and he reported significant joint pain in his neck and back. *See* R. 80. Overall, the ALJ did not give good reasons for discounting Dr. Luy's opinions.

The Commissioner maintains that the ALJ's alleged error with respect to the August 2013 opinion was also harmless because the ALJ accurately noted that this opinion—no matter who authored it—was inconsistent with Dr. Luy's other opinions. *See* ECF No. 28 at 16. It's true that the August 2013 opinion is inconsistent with the others and purports to be from a "treating physician." *See* R. 613. But the ALJ did not reject Dr. Luy's opinions because they were inconsistent with the opinions of another treating source. Rather, the ALJ thought "that Dr. Luy couldn't keep his story straight." ECF No. 29 at 2. That is a much more egregious accusation. At any rate, the Commissioner may not defend the ALJ's decision on grounds he did not embrace. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943)).

## CONCLUSION

For all the foregoing reasons, I find that the ALJ erred in evaluating Dr. Luy's opinions. Based on this record, however, I cannot determine whether Winston was disabled as of December 1, 2013. Accordingly, it is necessary to remand this matter to the Commissioner for a new step-five hearing.

The Commissioner's decision is **REVERSED**, and this action is **REMANDED** pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 19th day of June, 2020.

_____
STEPHEN C. DRIES
United States Magistrate Judge